The next matter on for argument is Molina v. City of Elmira. May it please the Court, the matters at issue before this Court are our request to grant judgment as a matter of law because there are probable causes insufficient in this matter without exigent circumstances. There was no showing of an emergency of the events that occurred in the arrest of Jose Molina Sr. Additionally, we are seeking the grant of a new trial for the unlawful preemption of the only minority in the entire panel and based upon the prejudicial comments of the judge during the charge which were ad libbed and added in. The, let me start with that. The judge noted during his charge that it was an evolving, chaotic situation. That's at the record at 869. By filing a lawsuit it's pretty easy to do. You just pay money. That's at 871. As I say, this was a fast evolving thing, again at 872. They didn't get a warrant, didn't need to do that, A877. You have to believe there was some serious situation that was at 883 through 884. And at 884 he recites as facts that Saunders and Perrigo were not part of the group that was in charge. Saunders testifies at 696 through 734 that Rico slammed the door, gave him the finger, he got bit by a dog and he pepper sprayed Rico. Saunders and Lincoln had not received the directive, that's what the judge said, so they went on the property regarding getting off of the property when Mr. Molina and his son said get off the property. Also the judge stated according to them they took him into custody and walked him down through the gate despite Mr. Molina's testimony that he was dragged through down on his face and that his pants fell down on his way to the patrol car. The judge also stated that after reviewing the officer's testimony it doesn't appear that Senior was the target of the pepper spray. It was Rico who was trying to pull Wandel in and was fighting with the others. That's at 676. And in total... Am I right in understanding that you're not challenged to the notion that the defendants here had probable cause to arrest both the plaintiff and his son? No, we're saying there was no probable cause to arrest the plaintiff. As well as no exigent circumstances. Correct. And Mr. Molina, the plaintiff, was found not guilty at trial on the charge of and the son was found? The son pled guilty to disorderly conduct. Correct. Now Mr. Saunders testified he was not entering the home when he went into the front yard. He clearly did not have any appreciation of the notion of curtilage. Front yard or porch? There's a front yard that's enclosed with a fence and then there's a porch. You go up some steps and the porch is open. That's what Mr. Wandel leaped over after sneaking down the alleyway in between. Why would there not be both probable cause... For your client, I just don't understand. There was a trial. We have to assume the jury credited the evidence most favorable to the defendants here. And there was testimony that your client was punching, hitting the officer as they were trying to arrest his son. Right? So that would be probable cause, right? That would be probable cause to arrest him for disorderly conduct, assault, or obstruction of administrative obstruction, not resisting arrest. Of course, the resisting... You need probable cause for one thing. You only need probable cause for... For an arrest, you only need probable cause for one offense. But he was found not guilty of the offense. And there was... That doesn't mean there wasn't probable cause. Well, okay. Even accepting that there was, Your Honor, probable cause in the absence of an emergency or exigent circumstances. That's a different question. That still fails. And I've searched the record, and Saunders, and then Skiver, and Wandel, and Perigo, and Lincoln. Nobody said there was an emergency. You're arguing first that there was no emergency to arrest the son, right? You're arguing there was no exigency to go on the property to arrest the son, right? Isn't that... Correct. Okay. If someone is standing on their steps, if they're going in and out in a domestic violence incident, who's angry, intoxicated, and saying, I'm going to F her up, okay, which is what the testimony was at the trial, you're saying an officer can't go on a porch and arrest someone in that situation? Not without a warrant. So what happens if the person who's saying, I'm going to F her up, okay, on this porch, the officer is supposed to, what, stand there and contact a judge to get a warrant? What if he goes into the house then? What kind of situation is the officer in then? The guy who has said, I'm going to F her up, has already committed a crime, is in his house. They don't know what he's doing in his house. They don't know whether he's going out the back door. They don't know whether he's getting a gun. You're saying the police officers can't go to the porch and arrest someone who's saying, I'm going to F her up, in that type of context, angry, intoxicated, history of incidents of domestic violence at the house? Correct. Because the Fourth Amendment, the protection that's afforded there, makes it And without an emergency situation, there was no one at hurt. Sweet had said she had no problem, she didn't want prosecution. Saunders testifies he was first on the scene at 7-19. They didn't interview the child who was supposedly called. There's no indicia of emergency here. Van Schuyver wasn't told there was an emergency. Wondell didn't say there was an emergency. And, Your Honor, there was a second entry into the home. To answer my question, if he goes back into the house, now what do they do? They're standing out there, they're saying, look, we've got to get a warrant, he's on this porch. He goes into the house after having said these things. Now what do they do? He is in the house. No, he's on the porch. He's saying, I'm going to F her up, on the porch, right? He came back out on the porch, according to Mr. Wondell. So the police officers say, we told him to stay inside his house, he comes back out, he's angry, he's intoxicated, he says that. You're saying they have to stand there and get a warrant, and I'm asking you, if he goes back into the house, now what do they do? If he goes back into the house, what do they do? He could run out the back door, go next door to see her, right? Speculation. Mr. Saunders testified that he knew nothing about him. They did not go in with their weapons drawn. They were not fearful of him having a weapon. There was no indication that he would flee from the scene. In any event, if you take that aside, Your Honor, and you take aside the idea that the son, that there was probable cause or some emergent circumstances to arrest him, to go back in and get my client. Go back in? I thought the testimony was that he was on the porch then, too. No. They cleared the scene. Saunders testified that he cleared the scene. He went around the corner. Wondell says, I'm going to go up between the houses, and I'm going to try to catch him out on the porch. He calls them back. They come back. By the time they come back, Wondell is in conflict in the house, according to my client, but in the door jam, according to them. He was on the porch when they went back and arrested your client, according to the officers. Right. In the door jam. Okay, so they didn't really enter the house. They arrested your client on the porch after having just gone on the property to get the son. But my client was not arrested until after they had cleared the scene. But he had already punched the officers, according to them. So he had already committed a crime. He's standing on the porch, and you're saying, even if they had exigency to arrest the son, as soon as the officers bring the son outside the gate, they can't go back and get the father on the porch? Well, that's right, because they needed an emergency to do that. They still were entering the property, and there was no emergency there. This is a man that's on oxygen. He's 70-some years old. He has COPD. He cannot walk. And they testified that they saw that, and they knew that. Before you sit down, I'd like you to address the Batson challenge, please, because I was concerned that the district court may have been confused about which of the two jurors, Mr. Santucci or Mr. Edwards, still harbored some resentment against the police. Am I right in understanding that all of the jurors of color were struck in the end from the jury? Yes, there was only one. Uh-huh. The Spanish translate, yes, Mr. Edwards, juror number five, he told the court that his son was arrested in North Carolina, and he was a freshman year in college. It was seven years ago. It was a breaking and entering, and the judge asked him if there was any restitution or the other counsel did, and he said, by dad, kind of joking, by dad, and that there was no evidence of bad feelings, as the court may note, that the defendants have indicated in response to the appeal that they're now attributing some kind of mannerisms or something else entirely different. But the district court said that one of the jurors was angry over the payment of restitution in connection with that arrest. Right. That was not in the words, so that must have been. And Santucci was the one who was left on the jury who expressed his complaint that the let me see if I can find the reference. Santucci said that his son was arrested six to eight months earlier. He was 27 years old, and he wanted to say he could be fair, and the judge said, well, we need you to do more than that. You need to say that you could be fair. And he says, I think I should be able to do that, and he said, this has been going on for years with my son that troubles with the police. Correct. Were you trial counsel? Yes. So did you understand the judge to maybe have confused the two jurors? At the time, I thought that they were referencing Mr. Craig, juror number four, because his son was arrested and was recently released from the Lakeview Shocks. The third juror whose son had difficulty with the police? Correct. He was recently released, and he was treated totally fairly. Well, I'll ask your adversary as well. Thank you very much. You have three minutes of rebuttal, and we'll hear from Mr. Horahan. May it please the Court. Jeremy Horahan on behalf of the defendants. Good morning, Your Honors. Actually, I don't know what time it is, but maybe good afternoon is this one. It's all 50. Fair enough. Good afternoon. So first, I just want to address the one issue about the arrest of Mr. Molina Sr., who's the plaintiff in this case. He was on the front porch during the arrest. The testimony from the officers, which is a testimony that's credited at this moment, is unequivocal, that he was on the front porch at the time of his arrest. He was not inside. Regardless, it was all part of one transaction. There was no reentry, no second emergency or anything like that. It was all one transaction. They were arrested contemporaneously. He was on oxygen, though, right? I looked at the video of his testimony, right? At that point, he was in the hospital. He had preexisting COPD. I understood he was in the house. He was on a hospital bed on the first floor there and on oxygen. It was just his normal bed. They were doing some construction on the bedroom of the house. They had moved his bed into the living room. He did sleep with oxygen, so he was wearing oxygen. But the testimony of the officers will tell you that he was also jumping up and down on the bed when they came in as well. He had obviously removed the oxygen at that point. The officers had testified that when they were struggling with the son, he would come over, hit Officer Wandel, then retreat back into the kitchen and come back. So the oxygen had been removed at that point. It was no longer on him. In response to your adversary's argument, the primary wrongdoer here, using language that Judge Bianco referred to in being intoxicated and making threats and so on, was the son. There's testimony, obviously, that Mr. Molina Sr. assaulted the officers, but he didn't seem to be posing an imminent danger to Ms. Sweet, I guess it is, next door. Would it have been impossible to go and get a warrant to secure the area in the meantime? Because I think they did take the son to the patrol car, and then there was a second motion. This wasn't happening all at once, even though, yes, it was kind of in the middle of the night and there was one set of altercations that were related. Yes, Judge. It did happen very quickly. So at the time of the arrest of Jose Molina Jr., the son, there were three officers on the scene at that time. And two officers escort a junior, we called him in the brief, to the vehicle. There was also a neighbor who happened to be a granddaughter of the plaintiff on the other side, so Heather Sweet's on one side, granddaughter's on the other, who's screaming and yelling. And again, it's 2 a.m. Neighbors are starting to congregate, so they also wanted to deal with her. At this time, plaintiff now comes out on the porch and he's yelling as well. And so at this time, the situation had turned chaotic. I mean, it's escalating, as the officers described, and they needed to get control of the environment, and they were worried about the crowd that was coming as well. And I believe, honestly, that the plaintiff was naked on his porch at this time. The officers felt at that time it's all happening at the same transaction. They needed to remove him from the situation, also because he just assaulted a police officer as well. It happened contemporaneous. The testimony in the record isn't even clear that all the officers left the property completely at that time. It happened really one after the other, contemporaneous arrests. So is it impossible was your question, Judge? No, it would not have been impossible to do that. Was it practical? Probably not in those circumstances because of the elevated risk that had occurred with the other neighbors that were approaching the scene and the yelling that was going on in multiple homes at that point. And it was resisting arrest of another, you know, so it is probable cause for his arrest, which should be noted that that was not brought up in the motion for judgment as a matter of law. And, frankly, there's only one sentence in this brief, I think, that matched it. It mentioned there may not have been probable cause, but I believe that portion has been abandoned in terms of this appeal, Judge. And judgment of matter of law was really with regard to exigent circumstances of the entrance onto the porch to arrest Jose Molina, Jr. As Your Honor mentioned at that time, intoxicated history of domestic abuse with the victim that had called, refusal to comply with police in and out of the home. There was danger and then the threats that were made right in front of the police officers. Could you address my concern about Batson? Absolutely. When I looked at the transcript, it seemed to me that the African-American juror was quite clear that he had no problem being fair and that that incident that had occurred with his son was over. He said, you know, that my son's doing great and we just want to make sure you don't have lingering feelings. He says, I would say no. Court says there are good police officers and bad, absolutely. Anything else would be a problem? No. So, fine. And then Mr. Santucci talks about his son having ongoing problems with the police. He can't give a straight answer about whether he'd have difficulty being fair. And he's, you know, it sounds like he has a problem. Yes, I had a couple of run-ins with him and the police. He had stood up to the police before when they had tried to question. And yet, it's the black juror who gets struck. And the judge says that he believed his son's arrest had been unlawful. I don't see any basis for that. And he was angry over the payment of restitution. You argue in your brief that this was a demeanor finding, but the language used suggested more that Mr. Santucci was still angry and not settled about this. I was concerned that the district court confused the two in assessing the Batson Challenge and allowed a black juror to be struck in a circumstance where it would be important to the fairness of the jury's deliberations overall to have a mixed jury. Can you help me out with this? Absolutely, Judge. If you review the portion of the record and some of the supplemental appendix that has this portion in it, when Mr. Edwards is answering the questions and he explains when his son was arrested, the first thing he says was that it was a breaking and entering. And he said, I realized, basically I learned, that you can't walk into an open door. And you could still be charged with breaking and entering basically if the door is open. Then he goes on to say, I could not prove or disprove the charges, showing that he didn't believe. We couldn't. We, yeah. He didn't. Disprove it. Yep. Meaning he felt that he didn't know if the charges were accurate or not. Then the judge asked, and, oh, and your son paid back the money? Dad did. And the impression that I had at that point, and I was trial counsel for this, Your Honor, was the feeling was he didn't believe that his son had committed the crime, or at least he wasn't convinced that he had committed the crime. And then he go on, well, how's he doing now? He's doing great. We just want to make sure you don't have problems. I would say no. There are good police officers and bad. Absolutely. Anything about that experience would be a problem. No. But then you go to Mr. Santucci and he says, you know, I stood up. My son has 27 aggravated unlicensed operators. He's in Roe County Jail. Sounds like he has a problem. I had a couple of run-ins with him and me and the police. You know, and then he can't answer straight up. He said, how do you think this affects your ability to decide the issues? I mean, at the time I was a little disgruntled with the police because of how it came down and how it happened, but I think over time I learned to adjust. I mean, I'm pretty unbiased on it personally. You want to say it? Yes, I can say I'm unbiased. I believe so. I think I should be able to be fair. He's much more equivocal. It goes on much longer. Are you confident that the judge didn't confuse the two? I am, Judge. The important part of the evaluation there was Mr. Santucci identified that it was his son that had the problem. His son had a drug problem. His son had a problem with the police. And he learned that it wasn't the police officers that were the problem, which is the exact scenario that we're dealing with in the lawsuit itself. We have a son who created this whole situation that brought police to the house, that ended up with the police arresting his son and the father. It was the son's fault, and that was part of my closing argument. This is a son, a father who won't blame his son. When we look at Mr. Edwards, he doesn't believe that any of the allegations were true, and he thinks the police may have falsely accused his son. Were there other African-Americans in the veneer? I don't know if any were put on the panel or not, Judge. I'm not sure, to be honest with you. I think there were none on the panel. I mean, with the veneer panel, I guess is what you're saying. Oh, yeah. I think there were more. I don't think they were called up necessarily. All were struck. I don't know if any were called to actually be questioned or if they were struck for a cause. I'm not sure. He's the only one that I'm aware of, Judge. But it was really that evaluation of how it applied to the case, the case at hand. And the case at hand was we have Mr. Santucci who came to terms and said, I realize my son was the issue. My son caused these problems, not the police that caused the problems. You don't read him as being equivocal about whether he could be fair in this? I'm sorry, Judge. Mr. Edwards. You didn't read his testimony as being equivocal about whether he could be fair, whereas Mr. Edwards was very straightforward that he could be fair. No, I didn't, Judge. I didn't. And, you know, the law on this, when we talk about it, it does give a lot of deference to district court judge and how they interpret it when they're there. And that was a lot of my brief, is how you interpret it when you're there in person and the mannerisms and the body language and the credibility. And I do understand when you just read the words on paper. The district judge says he was angry over the payment of restitution, but it was the other juror who said I was disgruntled. Right. Yeah. I mean, it's more I don't know if my son did this, and then I'm the one that had to pay $1,500 for this, you know. So I do understand where you're coming from, but I do not think the judge is confusing the two. No. I see that my time is up. Thanks. Thank you very much. Ms. Bosman, you have three minutes. Yes, Your Honor. And I think that the finding, if the jury relied on the issue of this being an evolving, chaotic, dangerous situation, that it can't be fairly relied upon with the judge's comments. The judge intervened in the fact-finding assessment of the evidence. His comments on the evidence taken as a whole indicated that it was an evolving, chaotic situation. They did not need to get a warrant. He says it's a fast-evolving thing. You have to believe there was a serious situation here, he said. He recited facts that were totally inaccurate. He said that Saunders and Porrego were not part of the group that were involved in the RICO arrest, which is totally contradicted by Mr. Saunders' own testimony, as well as Perigo's. So taking that commentary by the judge, which was ad libbed, it was not provided in the jury charge. He told the jury it was for them to decide the critical facts. Right. He did. So taking it as a whole, I don't see how you can say that the judge told them how they had to rule. I think that his comments, both by being inaccurate and observations of the evidence, make it an incurable problem. So I can tell you once that you get to decide the facts, but if I tell you five times what my opinions or the facts are and I've got the robe on, then you have been in, what's the word, you've stepped on the toes of the fact-finder. And it was so profound and so unexpected that there was really nothing that the jury could do with respect to that one comment, well, now it's your recollection of the facts and not mine. But yet he had already put in their minds what those facts were. And with respect to the comments of the juror that was struck, he said dad did. He didn't say I had to or anything. His demeanor was not at all distressed about the fact that dad did. And I think if you look at the circumstances, he and a friend had entered a dorm room that was a neighbor of theirs at the college that he talked about. He was totally fine with that. And, Your Honor, it is very, very difficult to get black jurors in northern New York. Isn't it a fair reading of what he's saying that he didn't think his son had committed any crime? Isn't that a fair reading when he says I realized that walking through an open door, you know, you can't walk through an open door even if you can't walk through a door even if it was open. Isn't that when someone says it that way, a suggestion, combined with we couldn't prove it or disprove it, suggests that he thought it was a wrongful arrest, right? Isn't that a fair reading of that? I don't think that that was the impression that I got. If that's the impression that the judge got, I didn't get that from his response to my objection. So that's the problem. And all we have is to rely on is the transcript. Thank you, Your Honors. Thank you very much. We'll take the matter under advisement. The final case on the calendar.